IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MASSACHUSETTS NURSES ASS'N,

         Plaintiff,

   v.

NATIONAL NURSES UNITED, AFL-CIO,

         Defendant.

Case No. 1:15-cv-11804-WGY

**DEFENDANT NATIONAL NURSES UNITED'S
MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS**

Michael T. Anderson (BBO #645533)
manderson@murphypllc.com
MURPHY ANDERSON PLLC
111 Devonshire St. 5th Floor
Boston, MA 02019
Tel. (617) 227-5720
Fax (617) 227-5767

Attorneys for Defendant
National Nurses United AFL-CIO

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Introduction and Summary | | 1 |
| Statement of Facts | | 2 |
| A. | The 2009 Foundation of the NNU | 3 |
| 1. | Formation of unified national union | 3 |
| 2. | Founding Constitution distinguished from subsequent membership-enacted Constitution in 2012 | 4 |
| 3. | Authority of NNU Convention | 4 |
| 4. | Jurisdictional disputes | 5 |
| B. | April 15, 2014 Executive Council Resolution | 6 |
| Argument | | 7 |
| I. | The Complaint Fails to State a Plausible Claim for Relief | 7 |
| A. | Standard of Review | 7 |
| 1. | Plausibility under *Twombly* and *Iqbal* | 7 |
| 2. | Documents referenced in the Complaint are considered on a Rule 12(b)(6) motion | 7 |
| B. | The Executive Council's Construction May Not Be Set Aside Unless It Is "Patently Unreasonable" | 7 |
| 1. | The national leadership's construction of the Union's Constitution is entitled to substantial deference | 8 |
| 2. | "Plausibility" under *Twombly* must be demonstrated in light of the deferential standard | 9 |

C.    The Executive Council Reasonably Held That the 2012
Constitution Controls Over Prior Documents    10

    1.    Jurisdictional dispute resolution    10

    2.    The initially negotiated Founding Constitution
is distinct from the membership's 2012 Constitution    11

    3.    The Affiliation Agreement provides that it is
subject to amendment after 2012.    12

    4.    Article IV plainly refers to "The Founding Constitution"    14

    -    Article IV's title    14

    -    Surrounding usage    15

    -    The purpose of the Agreement    16

Conclusion    17

Certificate of Service    18

## TABLE OF AUTHORITIES

Page

*Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 252 (1986)    9

*Ashcroft v. Iqbal,*    556 U.S. 662, 678 (2009)    7

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)    7

*Brown v. Department of Veterans Affairs,*

    451 F. Supp. 2d 272, 282 (D. Mass. 2006)    9

*Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*

    228 F.3d 24, 32 (1st Cir. 2000)    7

*Diva's Inc. v. City of Bangor,* 411 F. 3d 30, 37-38 (1st Cir. 2005    3, 7

*Dow v. United Bhd of Carpenters,* 1 F.3d 56,58 (1st Cir. 1993)    8, 9

*Florida Dept. of Revenue v. Piccadilly Cafeterias*

    554 U.S. 33, 48 (2008)      15

*G.T. Schjeldahl Co., Packaging Mach. Div. v. Local Lodge 1680, Int'l Ass'n of Machinists,*

    393 F.2d 502, 504 (1st Cir. 1968)      15

*Henning v. Wachovia Mortg., FSB*

    969 F. Supp.2d 135, 147 (D. Mass. 2013)      7

*Howard v. United Ass'n of Journeymen & Apprentices Local 131*

    560 F. 2d 17,21 (1st Cir. 1977)      8

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*

    309 F.3d 76, 85 (2d Cir. 2002)      15

*Local 48, United Bhd. Of Carpenters v. United Bhd. Of Carpenters*

    920 F. 2d 1047, 1052 (1st. Cir. 1990)      2, 8

*National Ass'n of Postmasters v. Hyatt Regency Washington*

    894 A.2d 471, 476 (D.C. 2006)      16

*Navarro-Ayala v. Hernandez- Colon,* 951 F. 2d 1325, 1342-43 (1st Cir. 1991)      15

*Pelletier v. Yellow Transp., Inc.,* 549 F. 3d 578, 581-582 (1st Cir. 2008)      17

*Porter v. Nussle,* 534 U.S. 516, 528 (2002)      15

*Service Employees Int'l Union v. Local 1199, Service Employees Int'l Union*

    70 F.3d 647,652 (1st Cir. 1995)      9

*Schaefer v. Indymac Mortg. Services,* 731 F. 3d 98, 100 n.1 (1st Cir. 2013)      2, 7

*United Bhd. of Carpenters, Local 42- L v. United Bhd. of Carpenters,*

    73 F.3d 958, 962 (9th Cir. 1996)      13

*VFC Partners 26 LLC v. Cadlerocks Centennial Drive, LLC,*

    735 F. 3d 25, 31 (1st Cir. 2013)      16

*Ward v. TheLadders.com*

    3 F. Supp.3d 151, 162 (S.D.N.Y. 2014)      15

## INTRODUCTION AND SUMMARY

The Massachusetts Nurses Association (MNA) is suing its national union, National Nurses United, AFL-CIO (NNU), for a declaratory judgment. The Massachusetts Nurses ask the Court to overrule the National Executive Council's interpretation of the NNU's founding documents. The Court should resolve this case on the pleadings and the incorporated documents.

In 2014, some NNU affiliates disputed jurisdiction over an organizing campaign in the District of Columbia. In resolving this dispute, the Executive Council held that the 2012 NNU Constitution controls over any contrary provisions in the 2009 Agreement of Consolidation and Affiliation (ACA or "Affiliation Agreement"), through which NNU was initially formed. The MNA now seeks declaratory relief against that reading. According to the MNA, the 2009 Affiliation Agreement imposed perpetual, unchangeable rules, impervious to later amendments in the NNU Constitution.

As the NNU Executive Council reads these documents, the Affiliation Agreement governed the interim "Founding Constitution" negotiated in 2009. This transitional period ended when the national membership adopted a full NNU Constitution in 2012. The Executive Council therefore looks to the 2012 Constitution as the NNU's supreme governing document.

The Executive Council's reading is entitled to deference. In disputes between national labor unions and local affiliates over the interpretation of foundational documents, the First Circuit upholds the national union's construction unless it is

1

"patently unreasonable." *Local 48, United Bhd. of Carpenters v. United Bhd. of Carpenters*, 920 F.2d 1047, 1052 (1st Cir. 1990).

The Executive Council's reading is reasonable. MNA claims that Article IV of the initial Affiliation Agreement trumps the Constitution. That provision referred to the "Founding Constitution," in place only until the national membership adopted its own in 2012. Article XIII(G) of the Affiliation Agreement acknowledged that its provisions may be amended. Such amendments required each founding union's consent, but only until 2012.

The Executive Council was right to treat the 2012 Constitution as authoritative. By denying its authority, the MNA is denying the NNU membership's power to amend their own Constitution. This would frustrate the purpose of the NNU's founding - to form a democratic union run by its members.

## STATEMENT OF FACTS

The relevant documents are undisputed. The 2009 Consolidation and Affiliation Agreement, Doc. 1-2, and its incorporated Founding Constitution, Docs. 1-3- through 1-5, are attached to the Complaint. The April 15, 2014 Executive Council resolution, quoted by the Complaint at ¶13, is attached to this motion as Ex. A to Anderson Decl., and the 2012 NNU Constitution, referenced by the Complaint at ¶13, is attached to this motion as Ex. B to Anderson Decl.

As we show in the Argument, the documents referenced in the Complaint are properly before the Court as attachments to a Rule 12(b)(6) motion, without converting the matter to a Rule 56 motion. *See Schaefer v. Indymac Mortg. Services,*

2

731 F.3d 98, 100 n.1 (1st Cir. 2013); *Diva's Inc. v. City of Bangor*, 411 F.3d 30, 37-38 (1st Cir. 2005).  While these documents speak for themselves, we identify the most important provisions material to this Motion.

### A.      The 2009 Foundation of the NNU

#### 1.      Formation of unified national union

As the Complaint acknowledges at ¶7, MNA and two other unions founded the NNU as a unified national labor organization. The Preamble to the 2009 Affiliation Agreement begins: "WHEREAS, UAN, CNA/NNOC and MassNA share the goal of building RN power by unifying all organizations representing RNs and creating a singular national voice for RNs." Doc. 1-2, p. 1.

The NNU Executive Council was given authority to administer the union's affairs, subject only to the National Convention. In the negotiated "Founding Constitution," attached as Exhibit A to the 2009 Affiliation Agreement, Doc. 1-3, the Executive Council has the "authority over National Nurses United's general direction and business affairs, including the authority to act for the membership in intervals between meetings of the Convention." Specifically, the Executive Council has the authority to "[i]nterpret the Constitution and National Nurse United policy", Doc. 1-3, Article V(B)(2), "resolve jurisdictional disputes between and among Affiliates," *id.*, Article V(B)(9). These provisions were preserved without amendment in the subsequent 2012 Constitution. Anderson Decl., Ex. B.

## 2.  Founding Constitution distinguished from subsequent membership-enacted Constitution in 2012.

The founding documents draw a distinction between the "Founding Constitution" negotiated by the three contracting unions in 2009, and the eventual membership-enacted Constitution reached through Conventions in 2011 and 2012.

The Founding Constitution was negotiated in advance by the three unions. Doc.1-2, 2009 Affiliation Agreement, Article II(A)-(C). This document was relatively inflexible for its three-year term. The founders allowed a Founding Convention to ratify the negotiated document, but denied it the power to amend the Founding Constitution. Doc. 1-2, Article III(C)(1). During the first three years of the NNU, the Founding Constitution could only be amended in emergencies by a 75% supermajority vote. *Id.*, Article IV(B). While the 2009 Affiliation Agreement could be amended, the founders required that "[d]uring the first three (3) years of the Agreement, amendments shall not be effective unless they are in writing and signed by the parties." Doc. 1-2, Article XIII(G).

By contrast, after three years, the national membership had the right to enact its own Constitution by a transitional Convention in 2011 with final approval in 2012, Doc. 1-2, Article III(D), with none of the same restrictions on amendments.

## 3.  Authority of NNU Convention

The national membership, acting through the Convention, is the supreme authority of the NNU:

> The Convention is the highest governing body of National Nurses
> United. Decisions of the Convention shall be the final governing

4

decisions of National Nurses United. The Convention shall have the authority to:

(a) establish National Nurses United policy;

(b) Interpret and amend the Constitution

* * *

Founding Constitution, Doc. 1-3, VI(B). These provisions were preserved in the 2012

Constitution. Anderson Decl., Ex. B, Article VI(B).

The parties agreed that the Convention would have meetings in 2009 (to

ratify the Founding Constitution without amendment), 2011 and 2012. Doc. 1-3,

Article VI(E)(2). The 2012 Constitution was formally adopted by the NNU

membership through the 2012 Convention. Anderson Decl. Exs. A-B. Unlike the

2009 Affiliation Agreement or the attached Founding Constitution, the 2012

Constitution did not require specific consent by each founding union, and no

founding union had individual veto power over the 2012 Constitution. The 2012

Constitution was simply the plenary act by the Convention of the NNU

membership. Anderson Decl. Ex. B.

### 4.   Jurisdictional disputes

Even under the 2009 Affiliation Agreement, the Executive Council had

discretion to resolve jurisdictional disputes according to six "guidelines."  Doc. 1-2,

Article VIII(B)-(C) and Doc. 1-5, Exhibit C of the Founding Constitution.

The National Convention amended these guidelines out of the 2012

Constitution. The 2012 Constitution did not adopt the specific "Organizing

Principles" listed at Article VI(B) and VIII(B)-(C) of the Affiliation Agreement, Doc.

1-2 and Exhibit C of the Founding Constitution, Doc. 1-5. The 2012 Constitution

simply gives the Executive Council broad authority to "resolve jurisdictional

disputes between and among Affiliates" Anderson Decl. Ex. B, Article V(B)(10)

without further constraints.

### B.      April 15, 2014 Executive Council Resolution

The Complaint references, and partially quotes, an April 2014 Resolution of

the NNU Executive Council. Doc. 1 at ¶¶ 13-16. The NNU Executive Council

Resolution of April 15, 2014, Anderson Decl., Ex. A, reads in full:

> There was a discussion on the Consolidation and Affiliation agreement
> between UAN, CNA/NNOC and MNA. Pam Allen, NNU legal counsel,
> presented legal interpretation of the agreement, and its relationship to
> the NNU Constitution. There followed a group discussion on whether
> the C & A agreement was intended to guide NNU beyond the founding
> constitution (in perpetuity) or to only guide NNU to the first
> convention.
>
> The discussion was called to question by Irma Westmoreland.
> Motion #2: Burger/ Engeldorf. Whereas the consolidation and
> affiliation agreement negotiated by and between the former UAN,
> CNA/NNOC and Mass NA in 2009 was intended to outline the
> structure of NNU and provide terms for a founding constitution; and
> Whereas, the C & A agreement served to guide the NNU officers
> during the term of the founding constitution; and Whereas, the NNU
> convention adopted a restated constitution in 2011 and an amended
> constitution in 2012.
>
> Therefore: Be it resolved that the governing document of the NNU is
> the constitution and the C & A agreement has no binding effect as of
> adoption by the convention of amended constitution in 2012. M/S/C (15
> for/ 5 against)

Anderson Decl., Ex. A.

<u>**ARGUMENT**</u>

**I.   THE COMPLAINT FAILS TO STATE A PLAUSIBLE CLAIM FOR RELIEF.**

    **A.   Standard of Review**

        **1.   Plausibility under *Twombly* and *Iqbal***

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

        **2.   Documents referenced in the Complaint are considered on a Rule 12(b)(6) motion**.

The documents referenced in the Complaint are properly before the Court on a Rule 12(b)(6) motion, without converting to a Rule 56 motion. *See Schaefer v. Indymac Mortg. Services*, 731 F.3d 98, 100 n.1 (1st Cir. 2013); *Diva's Inc. v. City of Bangor*, 411 F.3d 30, 37-38 (1st Cir. 2005). When such documents contradict allegations in the complaint, the documents trump the allegations. *See Henning v. Wachovia Mortg., FSB,* 969 F.Supp.2d 135, 147 (D. Mass. 2013) *citing Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000).

    **B.   The Executive Council's Construction May Not Be Set Aside Unless It Is "Patently Unreasonable."**

The Complaint gives a one-sided view of the relevant documents, pleading MNA's view of their meaning. This might be appropriate in an ordinary commercial

7

contract case, where the Court decides the meaning of the contract *de novo*.

However, it is not sufficient here.

### 1.   The national leadership's construction of the Union's Constitution is entitled to substantial deference.

Disputes over the meaning of union constitutional documents should not be decided like ordinary contract cases. In order to avoid judicial intrusion into union affairs, courts in this Circuit defer to the national leadership's interpretation.

"A labor union's internal affairs comprise an enclave best kept free from judicial intrusion." *Dow v. United Bhd. of Carpenters*, 1 F.3d 56, 58 (1st Cir. 1993), *citing Local 48, United Bhd. of Carpenters v. United Bhd. of Carpenters*, 920 F.2d 1047, 1051 (1st Cir. 1990); *Howard v. United Ass'n of Journeymen & Apprentices, Local 131*, 560 F.2d 17, 21 (1st Cir. 1977). "Thus, the scope of judicial inquiry is narrowly circumscribed in such cases. And, moreover, the resultant circumscription is particularly stringent when, as now, a labor organization's interpretation of its own constitution is singularly at issue." *Id., citing Local 48*, 920 F.2d at 1052.

As a result, the First Circuit reviews such disputes with great deference to the interpretation of the national union. "In *Local 48* [920 F.2d at 1052]. . . this court concluded that a general union's interpretation of its own governance documents will ordinarily be upheld 'unless that interpretation is patently unreasonable.' On that basis, we refused to second-guess the International when it advanced a 'plausible' reading of its constitution. *Id.* At bottom, then, *Local 48* stands for the proposition that, in the absence of bad faith, a labor organization's

8

interpretation of internal union documents puts an end to judicial scrutiny so long as the interpretation is 'facially sufficient' or grounded in 'arguable authority.'" *Dow*, 1 F.3d at 58. *See also Service Employees Int'l Union v. Local 1199, Service Employees Int'l Union*, 70 F.3d 647, 652 (1st Cir. 1995) (arbitrator's reading of affiliation agreement was plausible, despite local's objections that arbitrator's reading undermined its autonomy).

### 2. "Plausibility" under *Twombly* must be demonstrated in light of the deferential standard.

A dispositive pretrial motion must be judged against the standard of review that governs final judgment. For example, a motion for summary judgment "implicates the substantive evidentiary standard of proof that would apply at a trial on the merits." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

This rule applies to Rule 12(b)(6) motions as well. Where a complaint challenges an action subject to a presumption of rationality, Rule 12(b)(6) review requires the plaintiff to plead sufficient facts to raise a plausible inference of <u>irrationality</u>. *See Brown v. Department of Veterans Affairs*, 451 F.Supp.2d 273, 282 (D.Mass. 2006) (dismissing equal protection challenge under Rule 12(b)(6) where statute on its face met rational-basis test).

In this case, the "plausibility" requirement of *Twombly* and *Iqbal* requires the MNA to plead sufficient facts to show, not only that <u>its</u> interpretation of the relevant NNU documents is reasonable, but that the Executive Council's contrary view is "patently unreasonable."

9

### C.   The Executive Council Reasonably Held That The 2012 Constitution Controls Over Prior Documents.

#### 1.   Jurisdictional dispute resolution

MNA complains that the NNU Executive Council breaches the 2009 Affiliation Agreement whenever it holds that its terms have been superseded by Constitutional amendment. Complaint, ¶15.

An NNU affiliate would not have had a strong case against the Executive Council's assignment of jurisdiction, even prior to 2012.  Under the 2009 Affiliation Agreement, the Executive Council had discretion to resolve jurisdictional disputes according to six relatively vague "guidelines and principles." Doc. 1-2, Article VIII(B)-(C) of the Affiliation Agreement and Doc. 1-5, Exhibit C of the Founding Constitution. In light of that discretion, an aggrieved affiliate would have been unlikely to win a court challenge to an Executive Council jurisdictional ruling even prior to 2012.

However, in framing the democratically enacted Constitution in 2012, the membership deleted the specific "Organizing Principles" listed at Articles VI(B) and VIII(B)-(C) of the Affiliation Agreement and Exhibit C of the Founding Constitution. Instead, the 2012 Constitution simply leaves jurisdictional disputes between affiliates to the broad discretion of the Executive Council, without further constraints. *See* Article V(B)(10) of the 2012 Constitution, Anderson Decl. Ex. B (giving the Executive Council broad authority to "resolve jurisdictional disputes between and among Affiliates").

10

### 2.   The initially negotiated Founding Constitution is distinct from the membership's 2012 Constitution

MNA argues that the NNU national membership was powerless to amend the jurisdictional guidelines listed in the Affiliation Agreement in any future Constitution. MNA's argument might be more plausible if the founding unions had only agreed to an arms' length alliance governed by treaties, rather than a unified democratic organization. That is not what the parties agreed.

At the founding of the NNU, the three participating unions stated their intent as "unifying all organizations representing RNs and creating a singular national voice for RNs." Doc. 1-2, p. 1. The documents show that the first three years of the NNU were an interim period. Of necessity, the initial "Founding" Constitution had to be negotiated by the leaders of the three founding unions. It was ratified in a Founding Convention in 2009, but the Founding Convention limited to adopting the negotiated Founding Constitution as written, with no amendments. Doc. 1-2., Article III(C) of the Affiliation Agreement.

However, after this three-year period, the Affiliation Agreement recognized the plenary authority of the membership through the 2012 Convention to enact their own Constitution to replace the provisional one negotiated for them: "There shall be a convention in 2011 to amend the National Nurses United Constitution to provide for the composition of the Executive Council that will be elected at a Convention held in 2012." Article III(D) of the Affiliation Agreement, Doc. 1-2.

The parties agreed that the 2012 Convention was the "highest governing

body of National Nurses United. Decisions of the Convention shall be the final governing decisions of National Nurses United. The Convention shall have the authority to: (a) establish National Nurses United policy; (b) Interpret and amend the Constitution" Doc. 1-3, Article VI(B). Unlike the 2009 Convention, the 2012 Convention was not subject to limitations on its ability to amend the Constitution. *Compare* Affiliation Agreement, Doc. 1-2, Article III(C) *with id.*, Article III(D).

> ### 3. The Affiliation Agreement provides that it is subject to amendment after 2012.

MNA argues that the Affiliation Agreement created perpetual rights against any future amendments to the NNU Constitution: "There is no provision in the ACA that permits its nullification in general or the termination/voiding of paragraph IV(A) in particular." Complaint, ¶16.

This argument overlooks Article XIII(G) of the Affiliation Agreement: "This Agreement sets forth the entire understanding of the parties with respect to the subject matter hereof. <u>During the first three (3) years of the Agreement, amendments shall not be effective unless they are in writing and signed by the parties</u>." (Emphasis added.)

This provision is telling. It recognizes, first, that the rights under the Affiliation Agreement <u>are</u> subject to amendment. During the three-year term of the Founding Constitution, any amendment had to be signed off by each founding union. But after three years, this veto power of each founders does not continue. The parties clearly contemplated that, after three years, another authority could

amend those rights. That can only be the NNU membership as a body. The end of that three-year period coincides with the NNU Convention's adoption of a "full" democratic Constitution in 2012. The only plausible meaning of Article XIII(G) is that, after 2012, amendments could come from the Convention rather than the specific consent of the founding unions.

MNA argues that its Affiliation Agreement makes it permanently immune from constitutional amendments. Yet it agreed to a process where such amendments could be made, as part of life in a unified national union. This is no different than the local union's argument rejected in *United Bhd. of Carpenters, Local 42-L v. United Bhd. of Carpenters*, 73 F.3d 958, 962 (9th Cir. 1996). In that case, a Carpenters local argued that its Affiliation Agreement immunized it from any constitutional amendment that allowed the national union to select the local's business agents. Yet because the Affiliation Agreement contemplated that the local would be subject to amendments of the national bylaws, the Ninth Circuit concluded that the local had no ground to complain:

> Local 42–L essentially maintains that it should be altogether exempt from any new rules that might be implemented by the UBC to restructure union operations. The problem with Local 42–L's position, however, is that it is not supported by the Affiliation Agreement. "[W]hen [a local] voluntarily affiliate[s] with [an] International [Union], it bargain[s] away a measure of control over its activities in exchange for the strength it receive[s]." *Hansen v. Guyette*, 814 F.2d 547, 551 (8th Cir.1987). Local 42–L cannot enjoy the benefits that come with being affiliated with a large international union, without bearing the burdens.

73 F.3d at 962. This analysis applies here. The MNA agreed to form a unified

national organization. While it negotiated for limitations on the Founding

Convention's ability to amend the Constitution during the first three years, it

agreed that after 2012 no such restrictions would apply.

### 4.    Article IV plainly refers to "The Founding Constitution."

MNA relies on this language in Article IV(A) of the Affiliation Agreement:

"National Nurses United shall be governed by the National Nurses United

Constitution and the C&A [Affiliation] Agreement. In the event of a conflict

between any provision of the C&A Agreement and the National Nurses United

Constitution, the C&A Agreement will prevail." Doc. 1-2, Article IV(A).

The critical interpretive issue is whether Article IV(A)'s reference to the

"National Nurses United Constitution" means the Founding Constitution

negotiated with the Affiliation Agreement, or whether it refers to any and all future

NNU Constitutions not yet in existence.

This is not a close question. The "National Nurses United Constitution" made

subordinate to the Affiliation Agreement is the <u>Founding Constitution</u> in place for

the first three years, as the context of Article IV shows..

### -    Article IV's title

First, the title of Article IV is "The Founding Constitution and the C & A

Agreement." Doc. 1-2, Article IV. The parties clearly meant the "National Nurses

United Constitution" referred to in Article IV(A) to mean the <u>Founding Constitution</u>

described in the heading of that Article.

Titles and section headings "are tools available for the resolution of a doubt

14

about the meaning of a statute." *Porter v. Nussle*, 534 U.S. 516, 528 (2002). *See also Florida Dept of Revenue v. Piccadilly Cafeterias*, 554 U.S. 33, 48 (2008). The same principle applies to contracts. *See, e.g.*, *Navarro-Ayala v. Hernandez-Colon,* 951 F.2d 1325, 1342-43 (1st Cir. 1991) (using headings to interpret stipulation)*; Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 85 (2d Cir.2002) ("[c]aptions are relevant to contract interpretation"). While some contracts provide that section headings lack interpretive weight, the Affiliation Agreement did not so provide. The caption should therefore be considered in interpreting the meaning of Article IV(A). *See Ward v. TheLadders.com*, 3 F.Supp.3d 151, 162 (S.D.N.Y. 2014)

-       **Surrounding usage**

Second, the surrounding usage shows that Article IV(A) refers to the Founding Constitution, not any and all future Constitutions. Article IV(B) confirms the specific reference of Article IV's title by enacting a supermajority limitation on amendments to the Founding Constitution that does not apply to later enactments.

The Executive Council's interpretation follows the canon of *ejusdem generis*. This canon applies in interpreting federal labor contracts. *G.T. Schjeldahl Co., Packaging Mach. Div. v. Local Lodge 1680, Int'l Ass'n of Machinists*, 393 F.2d 502, 504 (1st Cir.1968) ("a subsequent specification impliedly limits the meaning of a preceding generalization.") This is also the general common law: "Where general words follow specific words in a[n] ... enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the

15

preceding specific words.[cit. om.]" *National Ass'n of Postmasters v. Hyatt Regency Washington*, 894 A.2d 471, 476 (D.C. 2006)[1]; *VFC Partners 26, LLC v. Cadlerocks Centennial Drive, LLC,* 735 F.3d 25, 31 (1st Cir. 2013), *quoting* 11 Williston on Contracts § 32:10 (4th ed.) ("Even absent a true conflict . . ., specific words will limit the meaning of general words when the specific words are consistent with the purpose of the agreement as a whole"). The Executive Council's interpretation of Article IV(A) is consistent with this canon. See 17A Am.Jur.2d *Contracts* § 364 ("Where general words follow the enumerations of particular kinds or classes of persons or things, the general words will, unless a contrary intent is manifested, be construed as applicable only to persons or things of the same general nature or class as those specifically enumerated.") Because the surrounding context concerns the Founding Constitution, the reference to the "National Nurses United Constitution" in Article IV(A) is reasonably read to mean the Founding Constitution referenced in that Article's title.

-       **The purpose of the Agreement**

To read the Affiliation Agreement as permanently limiting all future Conventions of the NNU would defeat the stated purpose of the Agreement and rob the members of their voice. The parties intended to create a democratic, national organization capable of enacting and amending its own Constitution. Founding Constitution, Doc. 1-3, Article VI(B); 2012 Constitution, Anderson Decl. Ex. B,

---

[1]The parties agreed that the Agreement would be governed by federal law, and otherwise by District of Columbia law. Doc. 1-2, Article XIII(E).

Article VI(B). Any interpretation of the Agreement should give effect to this purpose. *See, e.g., Pelletier v. Yellow Transp., Inc.*, 549 F.3d 578, 581-582 (1st Cir. 2008) ("Black letter law teaches that a construction which comports with the Agreement as a whole is to be preferred even if it be thought that certain language, viewed only by itself, more readily suggests something else.")

The parties protected themselves against constitutional amendments for the first three years, the period of the negotiated Founding Constitution. But to extend that veto power in perpetuity would prevent the NNU membership from governing their own union. That is not what the parties agreed to.

## CONCLUSION

The Court should dismiss the Complaint.

Dated:       July 7, 2015              Respectfully submitted,


                                       /s/ Michael T. Anderson
                                       Michael T. Anderson (BBO #645533)
                                       manderson@murphypllc.com
                                       MURPHY ANDERSON PLLC
                                       111 Devonshire St. 5th Floor
                                       Boston, MA 02019
                                       Tel. (617) 227-5720
                                       Fax (617) 227-5767

                                       Attorneys for Defendant
                                       National Nurses United AFL-CIO

CERTIFICATE OF SERVICE


I hereby certify that on this date I served a copy of the foregoing document via the Court's ECF system on the following:

James F. Lamond
McDonald Lamond Canzoneri
352 Turnpike Road, Suite 310
Southborough, MA -1772-1756
jlamond@masslaborlawyers.com


Dated: July 7, 2015                    /s/ Michael T. Anderson
                                       Michael T. Anderson (BBO #645533)
                                       manderson@murphypllc.com
                                       MURPHY ANDERSON PLLC
                                       111 Devonshire St. 5th Floor
                                       Boston, MA 02019
                                       Tel. (617) 227-5720
                                       Fax (617) 227-5767

                                       Attorneys for Defendant
                                       National Nurses United AFL-CIO

18